**McELROY, DEUTSCH, MULVANEY & CARPENTER, LLP**
1300 Mt. Kemble Avenue
P.O. Box 2075
Morristown, New Jersey  07962-2075
(973) 993-8100
Edward B. Deutsch, Esq.
Ronald J. Riccio, Esq.
Donna duBeth Gardiner, Esq.

**MARKS & KLEIN, LLP**
63 Riverside Avenue
Red Bank NJ 07701
(732) 747-7100
Gerald A. Marks, Esq.
Justin Klein, Esq.

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| RONALD DESANTIS, MATT SETSER, SHAWN DICKMYER, WILLIAM BRADLEY FREEMAN, SCOTT FACTOR, SCOTT INGENITO, AARON REEVES, ANTHONY HOBBY, DWIGHT LANKART, RICHARD FORTUNA, and PAUL VLADYKA,<br><br>On behalf of themselves and others similarly situated,<br><br>           Plaintiffs,<br><br>vs.<br><br>SNAP-ON TOOLS COMPANY, LLC, SNAP-ON CREDIT, LLC, and SNAP-ON INCORPORATED<br><br>           Defendants. | **Civil Action**<br><br>**Civil Action No.:**<br><br><br>**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiffs, Ronald DeSantis ("DeSantis"), Matt Setser ("Setser"),   Shawn Dickmyer ("Dickmyer"), William Bradley Freeman ("Freeman"), Scott Factor ("Factor"), Scott Ingenito ("Ingenito"), Aaron Reeves ("Reeves"), Anthony Hobby ("Hobby"), Dwight Lankart ("Lankart"), Richard Fortuna ("Fortuna"), and Paul Vladyka ("Vladyka"), on behalf of themselves and all others similarly situated, by way of Class Action Complaint against Defendants, Snap-on Tools Company LLC ("Snap-on"), Snap-on Credit LLC ("Snap-on Credit"), and Snap-on Incorporated, say:

## PARTIES AND JURISDICTION

1.      Plaintiff DeSantis is an individual residing at 1655 Chaplene Court, Dunedin, Florida, 34698.  DeSantis became a Snap-on franchised dealer on March 26, 2003.  As a result of the Deceptive Practices defined, described, and alleged herein, DeSantis' franchise failed.  The term "Deceptive Practice" means one or more of the deceptive practices about which Plaintiffs are complaining.  Snap-on terminated the franchise in or about March 2004.   DeSantis lost his investment in the franchise and has suffered damages.  The franchise agreement between Snap-on and DeSantis is attached as Exhibit A.  Defendants claim that DeSantis owes $16,030.12.

2.      Plaintiff Setser is an individual residing at 8627 Torchwood Drive, Trinity, Florida, 34655.  Setser became a Snap-on franchised dealer in March 2003.  As a result of the Deceptive Practices defined, described, and alleged herein, Setser's franchise failed.  Snap-on terminated him in or about September 2004.   Setser lost his investment in the franchise and has suffered damages. The franchise agreement between Snap-on and Setser is attached as Exhibit B. Defendants claim that Setser owes $428.68.

3.      Plaintiff Dickmyer is an individual residing at 9416 Junior Avenue, Apopka, Florida, 32703.  Dickmyer became a Snap-on franchised dealer on or about April 25, 2002.  As a

result of the Deceptive Practices, defined, described and alleged herein, Dickmyer's franchise failed. Snap-on terminated him on May 17, 2004. Dickmyer lost his investment in the franchise and has suffered damages. The franchise agreement between Snap-on and Dickmyer is attached as Exhibit C. Defendants claim that Dickmyer owes $103,915.24.

4.     Plaintiff Freeman is an individual residing at 1746 Old Marion Road, New Braunfels, Texas, 78130. Freeman became a Snap-on franchised dealer on or about January 1, 2003. As a result of the Deceptive Practices defined, described, and alleged herein, Freeman's franchise failed. Snap-on terminated him on or about September 15, 2003. Freeman lost his investment in the franchise and has suffered damages. The franchise agreement between Snap-on and Freeman is attached as Exhibit D. Defendants claim that Freeman owes $13,273.44.

5.     Plaintiff Factor is an individual residing at 7904 Griswold Loop, New Port Richey, Florida, 34655. Factor became a Snap-on franchised dealer on October 8, 1999. As a result of the Deceptive Practices defined, described, and alleged herein, Factor's franchise failed. Snap-on terminated him on or about December 31, 2003. Factor lost his investment in the franchise and has suffered damages. The franchise agreement between Snap-on and Factor is attached as Exhibit E. Defendants claim that Factor owes $45,569.01.

6.     Plaintiff Ingenito is an individual residing at 1289 Bear Run Boulevard, Orange Park, Florida, 32065. Ingenito became a Snap-on franchised dealer on June 17, 2002. As a result of the Deceptive Practices defined, described, and alleged herein, Ingenito's franchise failed. Snap-on terminated the franchise on or about December 31, 2003. Ingenito lost his investment in the franchise and has suffered damages. The franchise agreement between Snap-on and Ingenito is attached as Exhibit F. Defendants claim that Ingenito owes $30,679.07.

7.    Plaintiff Reeves is an individual residing at 4804 Bristol Trace Court, Keller, Texas, 76248.  Reeves became a Snap-on dealer in September 2000.  He bought a second franchise in June 2001.  As a result of the Deceptive Practices defined, described, and alleged herein, Reeves' franchise failed.  Snap-on terminated the franchises in November 2002.   The Reeves franchise agreements are attached as Exhibits G and H.  Defendants claim that Reeves owes $31,719.42.

8.    Plaintiff Hobby is an individual residing at 704 Foxglove Place, Brandon, Florida. He became a Snap-on dealer in October 2001.  As a result of the Deceptive Practices defined, described and alleged herein, Hobby's franchise failed.  Snap-on terminated the franchise in July 2003. Defendants claim that Hobby owes $85,448.23.  The franchise agreement between Snap-on and Hobby is attached as Exhibit I.

9.    Plaintiff Lankart is an individual residing at 3806 Alisa Ann Drive, Corpus Christi, Texas, 78418.  Lankart became a Snap-on franchised dealer on January 1, 2002.  As a result of the Deceptive Practices defined, described and alleged herein, Lankart's franchise failed. Snap-on terminated his franchise in April 2004.  The franchise agreement between Snap-on and Lankart is attached as Exhibit J.

10.    Plaintiff Fortuna is an individual residing at 617 Kings Highway E., Atlantic Highlands, New Jersey, 07716.  Fortuna worked as a Snap-on franchised dealer from 1995 through 2003.  His assigned List of Calls was in New Jersey.  He was assigned to the Greater New York Branch located in Edison, New Jersey.  As a result of the Deceptive Practices defined, described and alleged herein, Fortuna's franchise failed.  Fortuna is alleged to owe Snap-on approximately $8,026.78.  The franchise agreement between Snap-on and Fortuna is attached as Exhibit K.

11.     Plaintiff Vladyka is an individual residing at 57 Holly Court E., Brick, New Jersey, 08723.  Vladyka worked as a Snap-on franchised dealer from February 10, 2000, through September 12, 2003.  His assigned List of Calls was in New Jersey, and he was assigned to the Greater New York Branch located in Edison, New Jersey.   As a result of the Deceptive Practices defined, described and alleged herein, Vladyka's franchise failed.  Vladyka is alleged to owe $25,150.48.  The franchise agreement between Snap-on and Vladyka is attached as Exhibit L.

12.     Snap-on Incorporated is a publicly owned Delaware corporation that manufactures and markets tools and diagnostic solutions for professional tool and equipment users.  Its stock is listed on the New York Stock Exchange.  The company is divided into four segments:  the Dealer Group, Diagnostics and Information, Commercial and Industrial, and Financial Services.  The Dealer Group is operated by Snap-on Tools, LLC, a Delaware limited liability company with its principal place of business at 2801 80th Street, Kenosha, Wisconsin, 53143.   For the year ending fiscal 2004, Snap-on Incorporated reported total revenues of more than $2.4 billion of which $995 million resulted from sales to the franchisees in the Dealer Group.  The Dealer Group consists of about  3000 franchisees.  In terms of resources, expertise, and dependency, Defendants at all times herein relevant had significant advantages over Plaintiffs.  Pertinent portions of the 2004 and 2005 Snap-on Incorporated 10-K are attached as Exhibit M and Exhibit N, respectively.

13.     Snap-on Incorporated, through Snap-on, in an attempt to increase revenue, added franchisees to its United States Dealer Group between 1993 and at all times relevant herein.  As a result of this effort, many franchisees, including Plaintiffs, were added too quickly, overlapped too much with existing franchisees, and failed.

14.    Snap-on Credit is a Delaware limited liability company with its principal place of business at 950 Techology Way, Libertyville, Illinois, 60048. It commenced operations in or about 1999 as an off-balance-sheet unconsolidated 50/50 joint venture between Snap-on Incorporated and CIT Financial USA Inc. Snap-on Incorporated owns 50% of Snap-on Credit. Snap-on Credit is an affiliate of Snap-on Incorporated. CIT owns the remaining 50%. Snap-on Credit is authorized to conduct, and in fact does conduct, business throughout the United States. As a result of establishing Snap-on Credit, Snap-on Incorporated has been able to outsource to Snap-on Credit what it describes as its "domestic captive credit function". Plaintiffs are a part of the "domestic captive credit function". Snap-on Incorporated receives royalty and management fee income from Snap-on Credit based upon the volume of financings originated by Snap-on Credit. Snap-on Credit bears little risk for its loans because it sells substantially all of its originated financings through asset- securitization transactions to CIT. In 2004, Snap-on Credit originated financings totaling $481.2 million. Snap-on Credit's loans are secured by tools or equipment that franchisees, such as Plaintiffs, buy from Snap-on as well as other Snap-on franchisee assets. A significant part of Snap-on Credit financings are loans made to Snap-on franchisees, such as Plaintiffs, to enable them to purchase tools from Snap-on. Some standard Snap-on Credit programs offered to Snap-on franchisees include an Extended Credit Program, a Credit Sale Program, and a Lease Program.

15.    This Court has jurisdiction over the federal and supplemental state law claims pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964 and 28 U.S.C. § 1367. Diversity jurisdiction pursuant to 28 U.S.C. § 1332 also exists in that the citizenship between the parties is different and the amount in controversy exceeds $75,000.

16.     Venue is proper under 28 U.S.C. § 1391(a) in that a substantial part of the events or omissions giving rise to the claims by the Plaintiffs occurred in the District of New Jersey.

## CLASS REPRESENTATION ALLEGATIONS

17.     Plaintiffs bring this Class action pursuant to *Fed. R. Civ. Pro.* 23 on behalf of themselves and all other similarly situated persons.  The Class is defined as:

> All persons in the United States who are Former Franchisees or Current Franchisees as those terms are defined in Paragraph 2.17 [of the Settlement Agreement].

"Franchisees" are defined as "all individuals or entities in the United States who, from January 1, 1998, through April 18, 2006, operated one or more franchises, independent dealerships, and/or conversion franchises, but does not include trial franchisees or employees or independent contractors of Franchisees." A "Former Franchisee" "is a Franchisee who has sent in a notice to terminate or has been sent a letter of termination or has otherwise terminated by April 18, 2006, and has checked in prior to May 30, 2006." A "Current Franchisee" "is a Franchisee who is not a Former Franchisee." An individual or entity may be both a Former Franchisee as to one franchise and a Current Franchisee to another franchise.

Upon information and belief, the Class has about 6,800 members (including current and former franchisees).  All members of the Class assert claims for violation of law as more particularly set forth herein.

18.     All Class members pray for temporary and permanent injunctive relief as well as for compensatory and punitive damages, and, where permitted by law, treble damages.

19.     The Class meets the criteria set forth for the maintenance of a class action pursuant to Rule 23(a) and Rule 23(b)(3) of the Federal Rules of Civil Procedure, as follows:

20.     *Numerosity*.   There are some 6,800 members of the Class, which number is sufficiently large so that individual joinder of all of them is impracticable.

21.     *Typicality*.   The claims of the Plaintiffs are typical of the claims presented by the Class as a whole in that the Plaintiffs are, or were, franchisees who have been victims of and aggrieved by the same pattern of Deceptive Practices (as defined herein) perpetrated by the Defendants throughout the United States and generally applicable to all members of the class. The Deceptive Practices are the result of nationwide systemic policies, procedures and patterns of conduct adopted and centrally coordinated, implemented, and perpetrated by the Defendants. The Deceptive Practices damaged members of the Class.   The proofs of the Plaintiffs will prove the claims of all Class members.

22.     *Adequacy of Representation*.   The Plaintiffs do and will fairly and adequately represent and protect the interests of all members of the Class.   Plaintiffs have no interests that conflict with or are antagonistic to the interests of the Class members as a whole.   Plaintiffs have retained attorneys competent and experienced in class action and complex commercial litigation.

23.     *Common Questions of Fact Predominate*.   The predominant common nucleus of operative facts to be determined for the Class are typical for the representative parties and for each member of the class and are based on the systemic pattern of Deceptive Practices perpetrated by the Defendants throughout the United States.    The predominant common questions of fact include, but are not limited to, the following:

- Snap-on's and Snap-on Credit's Deceptive Form Agreements;
- Snap-on's Deceptive Weekly Minimum Purchase Requirement;
- Snap-on's Deceptive Recruitment of Franchisees;
- Snap-on's Deceptive Sample Budgets;

- Snap-on's Deceptive Domination and Control of Franchisees;

- Snap-on's Deceptive Lists of Calls Assigned to Franchisees;

- Snap-on's Deceptive Predatory Lending Practices;

- Snap-on's Deceptive Failure to Disclose Material Facts to Franchisees;

- The Inherent Conflicts of Interest Between the Snap-on Field Managers and Branch Managers and Franchisees;

- Snap-on's Deceptive Efforts to Add Franchised Dealers and Thereby Add Consumers;

- Snap-on's Deceptive Termination of Franchisees; and

- Snap-on and Snap-on Credit's Deceptive Arbitration Clauses.

24.    *Common Questions of Law Predominate.*  All of the issues of law are common to the members of the Class and predominate over individualized issues of law.  The issues of law common to the Class include, but are not limited to, the following:

- Whether Defendants' pattern of Deceptive Practices violates state consumer protection and state franchise practices acts;

- Whether Defendants' pattern of Deceptive Practices constitutes common law fraud;

- Whether Defendants have a fiduciary duty to the Class members, the extent of that duty, and whether it has been breached;

- Whether Defendants breached their franchise and loan agreements and/or breached the implied covenant of good faith and fair dealing owed to the Class members;

- Whether injunctive relief is warranted based on the pattern of Deceptive Practices generally applicable to all the members of the class;

- The amount of damages owed to the Class members; and

- Whether Defendants violated the federal Racketeer Influenced and Corrupt Organization Act ("RICO").

25.   *Common Arbitration Provisions.*   Plaintiffs signed a form franchise agreement with Snap-on and other agreements with Snap-on Credit.   These agreements all contain essentially the same arbitration provision.   Certain Arbitrators have determined that the arbitration agreements permit class actions.

26.   *Superiority.*   A class action is superior to, and more manageable than,  any other available method for the fair and efficient adjudication of this controversy, because:  (i) common questions of law and fact overwhelmingly predominate over any individual questions that may arise, such that there will be efficiencies to the courts throughout the United States and to the parties in litigating the common issues on a class basis rather than on an individual basis; (ii) the damages to some class members are larger than to others, with some being sufficiently small that individual prosecution of the claim would not be an economically viable alternative; (iii) class treatment is desired for optimal deterrence, compensation and protection of the public; (iv) the economies of scale inherent in litigating similar claims on a common basis will enable this case to be litigated on a cost-efficient basis as a class action in federal court, especially when compared to repetitive individual actions; and (v) no unusual difficulties are likely to be encountered in the management of this class action as the proofs as to liability are common to all Class members.

## DEFENDANTS' DECEPTIVE PRACTICES

**A.    Snap-on Incorporated and Snap-on's History of Deceptive Practices.**

27.   Snap-on Incorporated and Snap-on have a long history of operating their businesses by means of exploitation of its sales people. In 1963, the FTC concluded that Snap-on's arrangements with its salespersons that, at that time, had contracts to service specific geographic territories were unfair acts and practices as well as unfair methods of competition in

violation of 15 U.S.C. § 45. The FTC found that Snap-on required its salespersons to sign onerous contracts containing unfair restrictive provisions that included both price-fixing and placing highly desirable customers off-limits. The FTC issued a cease and desist Order. Though the Order was modified by the Seventh Circuit, Snap-on's business practices were sharply criticized.

28.     In 1979, Snap-on received an informal advisory opinion from the FTC declaring that Snap-on was not subject to the rules governing sales of franchises. In seeking the advisory opinion from the FTC, Snap-on represented to the FTC that its franchisees were not required to make purchases from Snap-on in excess of $500 in the first six months after the franchisees started their business operations. Subsequently, Snap-on's representations to the FTC proved to be false.

29.     By the early 1980s, there were more than 2,000 Snap-on franchisees in the United States. Snap-on continued to increase its control over the manner in which franchisees were allowed to conduct business. Snap-on franchisees were required to visit customers every week instead of every month as had previously been the practice. Further, Snap-on stopped granting geographic territories to franchisees, but rather specified a List of Calls consisting of specific dealer stops. The List of Calls became the Snap-on franchisees' sole potential customer base. Throughout the 1980s, Snap-on also implemented various policies and procedures designed to increase the number of franchisees and, therefore, the number of its consumers, while simultaneously beginning to decrease the number of stops on the List of Calls to whom the franchisees were permitted to sell. One such program, designated "35 keeps us alive," pressured franchisees to surrender 35 customer locations from their exclusive List of Calls thereby

shrinking the number of potential end-user customers to whom the franchisees were allowed to sell.

30.     In 1990, the FTC again reviewed Snap-on's business methods and concluded that its informal ruling of 1979 was no longer valid.  The FTC strongly intimated that Snap-on had lied to the FTC.  The FTC ruled that Snap-on was selling franchises without complying with federal regulations and ordered Snap-on to meet federal disclosure guidelines for the sale of franchises. The FTC's letter to Snap-On is attached as Exhibit O.

31,     Throughout the 1990s, Snap-on continued to recruit new franchisees while at the same time either terminating pre-1990 franchisees or converting them to a franchise model. Currently, there are very few Snap-on franchisees who have not signed the Snap-on form franchise agreement that the Plaintiffs have signed.   There are currently approximately 3,500 Snap-on franchisees in the United States.

32.     Throughout its history, but especially recently, Snap-on engaged in an unusually large amount of litigation with its franchisees.  Between 1999 and March 2004, Snap-on hired outside legal counsel to represent it on more than 600 occasions in connection with disputes between Snap-on and its franchisees

**B. Snap-on's Deceptive Distribution Model**

33.     Snap-on sells its automotive tools through a mobile dealer distribution network of franchisees. The franchisee runs his business from a large, white van.  Franchisees typically make stops on a regular basis to provide sales, service, and financing to end-users of Snap-on products.  Snap-on franchisees are unorganized, highly dependent on Snap-on, and typically not able to immediately find viable alternative employment if they fail as a franchisee.

34.     Snap-on Incorporated computes, and publicly reports, its sales on the basis of products sold to its dominated and controlled franchisees, not on re-sales by franchisees to the end users of Snap-on products.  By controlling its United States franchised dealer network, Snap-on is able to control the consumer market for its products because Snap-on's franchisees are Snap-on's consumers.  In 2005, the United States Snap-on consumers-franchisees accounted for almost $1 billion of Snap-on Incorporated's $2.4 billion in revenue.  In the Snap-on distribution channel, the franchisees serve as the sales arm of the manufacturer.  The franchisees incurred costs in functioning as the sales arm.  Snap-on's profits, on the other hand, are not determined by sales to the end user or by dealer costs but solely by the volume of sales to franchisees and mark-ups charged to franchisees.   Snap-on's revenues increase as sales to franchisees increase, regardless of whether the franchisees are able to successfully re-sell to end-users.

35.     The Plaintiffs, like every franchised Snap-on dealer, signed a form Snap-on franchise agreement containing pages of fine print.  The franchise agreement is an adhesive contract that contains more than 30 paragraphs with numerous subparts.  Most of the details of the franchise relationship are, however, contained in a separate document that is several hundred pages in length. This document is called the Dealer Operations Manual.  The Dealer Operations Manual was not provided to the Plaintiffs until shortly before or just after they signed the Franchise Agreement.  This is a Deceptive Practice.

36.     The form franchise agreement ambiguously and inconspicuously requires the franchisees to maintain a minimum inventory and to purchase, on a weekly basis, a minimum amount of tools from Snap-on regardless of whether the franchisees wanted or needed to buy the tools.  The minimum inventory and purchase requirements guarantee Snap-on a minimum level of sales to each Snap-on franchisee in the United States, regardless of the franchisee's ability to

re-sell any of the product to end-users. If a franchisee fails to make the minimum weekly purchase from Snap-on, the franchisee is subject to termination. Upon information and belief, the franchise agreement in effect while the class members were Snap-on franchisees provided at Section 20(b)(10), that Snap-on had a right to terminate the franchise for failure to make the required weekly minimum purchases. The form agreement provided that Snap-on may terminate the franchise agreement:

> If, after any fifty-two (52) consecutive weeks, Standard Franchisee's average weekly purchase of Products from Snap-on during that period, measured by suggested retail prices, are less than seventy percent (70%) of the average weekly purchases of Products by all full-time franchisees in the Branch Office to which Standard Franchisee is assigned for the same period.

37.     In addition to the minimum weekly purchase requirement, franchisees were simultaneously assigned Lists of Calls by Snap-on pursuant to Section 1 of the franchise agreement. Despite the obvious inter-relationship of the concepts, Snap-on separated these elements in the franchise agreement by numerous pages of fine print. The List of Calls contained the names and addresses of businesses, or Dealer stops. Snap-on only allows a franchisee to re-sell tools to the entities on the particular List of Calls assigned to that franchisee. The contents of every List of Calls were dictated by Snap-on to the franchisees and determined exclusively by Snap-on.     The Lists of Calls assigned to the franchisees were economically unviable. The form franchise agreement  provides the following with respect to the exclusivity of the List of Calls:

> Standard Franchisee shall not be entitled to use the Snap-on program or sell Products at any location not identified on the List of Calls even if the location is adjacent to, or near, a location on Standard Franchisee's List of Calls, or to any customer of Standard Franchisee who moves to a location not identified on the List of Calls. If Standard Franchisee desires to use the Snap-on Program or sell Products at any location not identified on the List of Calls, Standard Franchisee shall notify Standard Franchisee's Field

Manager and request that the additional location(s) be added to the List of
Calls.   Snap-on, in its sole business judgment, which shall not be
unreasonably withheld, shall determine whether these location(s) will be
added to Standard Franchisee's List of Calls.

38.     The form franchise agreement also uniformly gave Snap-on the right to
unilaterally adjust or shrink the List of Calls:

Weekly visits by Standard Franchisee to customers, high quality service to
customers and the solicitation of potential customers at stops at Standard
Franchisee's List of Calls are essential elements of the Snap-on Program.
Accordingly, Snap-on reserves the right to adjust Standard Franchisee's
List of Calls and thereby change the number and/or location of stops on
the List of Calls if Snap-on determines in its sole business judgment that
such changes are necessary because of existing or future competition,
inadequacy of service to customers, inadequacy of solicitation of potential
customers, or for such other reasons as Snap-on deems relevant.

39.     The combined effect of the minimum inventory requirements, weekly minimum
purchase requirements, and the exclusive, but economically unviable, Lists of Calls assigned to
the franchisees are Deceptive Dractices causing franchisees to fail.

## C.  The Deceptive Recruitment Process

40.     Snap-on followed a systematic pattern of recruiting unsophisticated people, with
little or no prior experience running their own business, to become Snap-on franchisees.  It did,
and does so, by means of false misrepresentations and deliberate failures to disclose material
facts.

41.     Upon information and belief, the Lists of Calls assigned to the Plaintiffs had, in
whole or in part, already proved unviable for prior franchisees.  The Lists of Calls assigned to the
franchisees did not have the economic viability to pay for the amount of product they were
simultaneously required to buy from Snap-on, much less provide a profit.

42.     During the course of the recruitment process, Snap-on managers, at the direction
of Snap-on, also made false representations that were intended to lure persons into becoming a

Snap-on franchisee.  The false representations understated the risks and overstated the rewards of becoming a franchised Snap-on dealer.

43.    A particularly egregious Deceptive Practice was the budget provided by Snap-on to the class members by the managers during the recruitment process. The sample budget used by Snap-on omitted key expenses, and/or understated key expenses, and overstated a franchisee's prospects for success.

44.    Snap-on and its managers, at all times relevant hereto, in addition to affirmatively understating risks and overstating rewards also knowingly failed to disclose to prospective franchisees the following material facts about Snap-on's business:

- More than one-third of new franchisees were out of business in two years;

- More than one-half of new franchisees were out of business in five years;

- More than three-fourths of new franchisees were out of business prior to the expiration of the 10-year term of the franchise contract;

- Many Snap-on franchisees owe money to Snap-on when they go out of business, sometimes hundreds of thousands of dollars;

- The Lists of Calls (which limits to whom the class members can re-sell tools), were arbitrarily established by Snap-on according to subjective criteria and varied widely in economic potential and viability;

- Snap-on took no steps to oversee the creation of the Lists of Calls, or to insure that the Lists of Calls assigned were sufficient to support a viable business;

- Regardless of the economic viability of the Lists of Calls, franchisees are required to purchase on a weekly basis a minimum amount of tools from Snap-on—in an amount equal to an artificially fixed percentage of the branch average—or else either be terminated or incur substantial debt to Snap-on;

- The Lists of Calls assigned may have previously been assigned to prior franchisees who failed;

- More than one quarter of Snap-on franchisees have disputes with Snap-on when they leave, which disputes are sufficient to cause Snap-on to hire outside legal counsel to

represent Snap-on (including more than 600 instances between 1999 and March 2004);

- Snap-on Branch Managers and Field Managers make most of their money, and receive prizes, based on commissions from tools shipped regardless of whether a franchisee is able to re-sell the tools; and

- At the same time Snap-on was closing many franchises it owned for its own account, it simultaneously induced prospective franchisees to open new ones.

45.    Defendants' affirmative misrepresentations and failure to disclose material facts in connection with the recruitment process are part of a systemic pattern of Deceptive Practices that are generally applicable to and have harmed the Plaintiffs, persons similarly situated to Plaintiffs, and continue to harm the public.

### D.  The Deceptive Domination And Control Of The Franchisees

46.    Snap-on had the power to control and did, in fact, exercise absolute control over the franchisees. Every action taken by a franchisee had to be in accord with Snap-on's requirements.   Failure to follow Snap-on's orders was grounds for termination.   Snap-on's control over the franchisees ranged from dictating how routine paperwork would be prepared, to how much product they had to buy, to whom the product could be re-sold, to how inventory would be ordered and stored, to what kind of Snap-on approved clothing would be worn.  Snap-on's control is set forth in hundreds of pages of adhesive form documents.

### E.    The Deceptive List Of Calls

47.    The key to establishing the exclusive Snap-on dictated List of Calls is the Snap-on survey.  In theory, the survey is supposed to be an honest effort to carefully determine how many persons are viable prospects to be regular buyers of Snap-on tools.  But the Snap-on surveys were false, misleading, and bogus.  The prototypical potential end-user customer for Snap-on's products is an independent "wrench turning" automobile mechanic who needs to buy a

significant amount of tools in order to do his work.  But included on the List of Calls assigned to the franchisees were, for example, bicycle shops and audio shops. While all of these stops may buy the occasional tool, all clearly had far less market potential to purchase a Snap-on tool than would the Snap-on prototypical end-user.  Counting such stops as viable potential customers is a Deceptive Practice.

48.     Another deception is that the survey typically contained an inadequate quantity of potential end-user customers and contained customers who typically had already failed to support a prior dealer.  In 2003, 478 franchisees left Snap-on.  All of those franchisees were replaced by Snap-on in the same year, as Snap-on opened 484 new franchises.  The replacements were typically assigned a List of Calls established pursuant to Snap-on's bogus surveys.

49.     Snap-on knew, recklessly disregarded the fact, and/or was aware that the method used to determine the Lists of Calls assigned to franchisees resulted in business opportunities that were wholly inadequate to sustain a viable business and to meet the minimum weekly purchase requirement.  Because of the pressure to grow the business, Snap-on assigned Lists of Calls that were economically unviable and which caused, and continue to cause, franchisees to suffer damages.

50.     The method used by Snap-on to determine a franchisee's List of Calls was subjective and resulted in an unviable List of Calls.  Snap-on systematically failed to review or check the Lists of Calls and were callously indifferent to the harm being caused to the franchisees.  There was no Snap-on system or procedure in place to review Lists of Calls to determine whether the Lists of Calls had been properly prepared or whether the franchisees' Lists of Calls were sufficient to sustain a business.  On this – perhaps the most critical determinant of the Plaintiffs' prospects for success – Snap-on did no review or quality control

whatsoever.  Even when several franchisees in succession failed to earn a living servicing a particular List of Calls, Snap-on took no action to review or investigate the sufficiency of the List.  Snap-on simply reassigned the failed List of Calls to next franchisee.

### F. The Deceptive Predatory Lending Practices

51.     Prospective franchisees typically do not have much personal money to finance initial tool purchases from Snap-on or for other start-up costs.  They are typically required to obtain loans and pledge personal assets as security.  Considering their lack of sophistication and need for money, they were an easy target for, and fell victim to, Snap-on's and Snap-on Credit's deceptive predatory lending practices.

52.     Snap-on and/or Snap-on Credit systematically provided initial loans to cover the cost of the franchise fee, the purchase or lease of an appropriate van, and the purchase of the mandated initial inventory (the initial inventory purchase is approximately $85,000 at cost).  The total cost to become a Snap-on dealer based on 2004 data is between $157,563 and $264,308. Between 1998 and 2003, Snap-on added 2,430 new franchises and collected fee income from these persons of between $359,844,339 and $563,624,048.  During that same time period, 2,308 franchisees closed their franchises.  Once the franchisees were in business, they were then required by Snap-on to make minimum purchases from Snap-on each week whether they could afford, or needed, to do so.  These purchases were made at the same time the franchisees were required to pay down their initial debt to Snap-on and/or Snap-on Credit.  A portion of these ongoing minimum weekly tool purchases from Snap-on were made by means of Snap-on and/or Snap-on Credit providing money to the franchisees.  The funds provided by Snap-on to franchisees to purchase additional tools appeared as an increasing balance on the dealer's "tool bill."  The tool bill usually had a "credit limit" of $10,000 - $30,000, beyond which the dealer

could not receive tools ordered. The credit limit was routinely ignored, and the franchisees were allowed, even encouraged, to purchase more than they could afford so that Snap-on could sell more tools to them and, thereby, increase recognized revenue. This was to the economic detriment of the franchisees but to the bottom-line benefit of Defendants.

53. When the tool bills became excessive, franchisees were given two options, neither of which was in their best interest. The first option was that Snap-on would put a dealer on "tool hold," meaning the dealer could not purchase additional tools from Snap-on, including items which had been ordered by customers on his List of Calls. The second option was to borrow even more money, usually through a Snap-on Program known as Invoice 101 or a Snap-on Credit line of credit pursuant to one of Snap-on Credit's Programs.

54. In order to be removed from "tool hold," franchisees had to pay down the tool bill debt. Because they rarely had an outside source of funds to pay down the tool bill, the franchisees would borrow even more from Snap-on or Snap-on Credit. One deceptive device used by Snap-on and/or Snap-on Credit is known as the Invoice 101 Program. Another device involved Snap-on Credit providing a "line of credit." The "line of credit" had a high rate of interest. Franchisees were expected to use the proceeds from the "line of credit" to buy more tools from Snap-on, even if they had no market potential for re-selling the additional tools. The more tools franchisees bought, the more money Snap-on and Snap-on Credit made, and the more in debt the franchisees became.

55. Snap-on and Snap-on Credit reported revenue based on the increased financing revenue, while the franchisees' financial positions deteriorated. Through this scheme, many thousands of dollars could be owed by a franchisee to Snap-on and/or Snap-on Credit. Snap-on and/or Snap-on Credit thus made it easy for franchisees to buy more tools from Snap-on while at

the same time pyramiding the escalating cycle of the franchisees' debt.  Snap-on Credit did not

incur any risk on these loans because Snap-on Credit sold substantially all of its originated

contracts, through an asset-securitization transaction, on a limited recourse basis to the CIT

Group.

56.    The Invoice 101 Program was a particularly pernicious predatory scheme.  The

Program was set up for franchisees with tool bill balances that had become so high that the

franchisees were no longer able to make their required weekly payments, thus putting them in

default.

57.    Under the Invoice 101 Program, the franchisee, in order to pay down his tool bill,

had to turn over to Snap-on an exorbitant sum equal to 70 percent of the weekly paid sales

derived from the List of Calls.  In return, the tool bill balance was reset to zero.  If the franchisee

objected to the Invoice 101 Program, he remained on tool hold.  Tool hold meant he would not

be able to buy new tools and would be functionally out of business.  The Invoice 101 Program is

a predatory lending scheme.  In essence, Snap-on and/or Snap-on Credit had found a way to use

self-help to garnish the dealer's sole source of income from the List of Calls in order to inflate

Snap-on's sales and profits.

**G.    The Failure To Disclose the Inherent Conflicts of Interest
Between Franchisees and the Snap-on Managers**

58.    A primary source of compensation for Snap-on Branch Managers and Field

Managers was commissions, bonuses, prizes, and awards based on sales made by them to the

franchisees.  This created an inherent conflict between the managers and the franchisees.  This

material conflict of interest, at all times herein relevant, was not disclosed.

59.    The Snap-on managers conducted numerous and regular deceptive sales

incentives, deceptive contests, and other deceptive promotions designed to encourage franchisees

to buy more tools from Snap-on, thereby increasing Snap-on's revenues.  These deceptive incentives, contests, and promotions were sponsored by Snap-on and were Deceptive Practices because, unlike the typical sales contests, the contest winner is not the dealer who can <u>sell</u> the most, but rather the dealer who can <u>buy</u> the most from Snap-on.  The primary motivation of the managers for pressuring the Plaintiffs to make purchases from Snap-on was to earn commissions, bonuses, prizes, and awards for themselves based on sales to the Plaintiffs.  Some of the managers received free vacations to exotic locations based on purchases they were able to induce the Plaintiffs to make from Snap-on.

60.    One device used by Snap-on managers to increase the franchisees' purchases from Snap-on was called the promotional pack of the month ("Promo Pak").  The Promo Pak, consisting of a selection of tools, can cost as much as $5,000.  It was featured at monthly sales meetings, and was offered at a discount compared to the normal price, but it was an all-or-nothing package.  When franchisees bought the Promo Pak, they could not pick and choose among items.  The Promo Pak is an illegal tying arrangement and a forced-line-sales mechanism.

61.    If the Plaintiffs refused to buy the Promo Pak, they had to say so in front of their peers, thus appearing either to be unable to afford it, and therefore either a failure or someone who didn't want to be a team player.  Even if a franchisee summoned up the courage to publicly refuse to buy the Promo Pak, it was often shipped to him anyway as if he had made the purchase. The total cost was involuntarily added to his tool bill loan.  This involuntary sale to franchisees was done pursuant to Snap-on's so-called automatic shipping policy.

62.    The Dealer Operations Manual recites in its Introduction: "At Snap-on, we have a strong commitment to the success of our people.  After all, your success is our success."  The Deceptive Practices described herein are concrete evidence that these statements are not true.

63.     While Snap-on and its managers were pressuring franchisees to make uneconomical purchases from Snap-on and to borrow monies to do so, they did not disclose that there were instances in which it was not in the best interest of the franchisees to make the purchase or to borrow the monies.  Purchasing a Promo Pak was not good for many franchisees businesses, but was always good for Snap-on and its managers because it generated revenues for Snap-on, thus enhancing Snap-on's overall financial condition.  It was particularly good for the managers because they were paid commissions, received bonuses or obtained free vacations based on the amount of tools the franchisees bought from Snap-on, rather than on the amount of tools the franchisees sold to their Lists of Calls

**H.      The Deceptive Effort to Add Dealers Thereby Adding Snap-on Consumers**

64.     As part of its constant drive to increase sales to franchisees, Snap-on implemented various programs that had as a single goal adding franchisees and, thereby, increasing revenues. For many years, Snap-on has maintained a policy of increasing franchisees.  In 1978, Snap-on had 2,372 franchisees.  There are currently some 3,500 franchisees.  Increasing the number of franchisees has been accomplished primarily through shrinking the size of the List of Calls. For Snap-on to add a dealer is to add another dominated and controlled consumer who must pay an initial franchise fee to Snap-on while also making weekly minimum  tool purchases.

65.     In the mid 1990s, Snap-on adopted a program entitled "More Feet on the Street". The effect of the "More Feet on the Street" program was to further increase the number of franchisees-consumers who would be obligated to buy tools from Snap-on.  This program reduced the profit potential for the franchisees by making it harder to increase sales to a shrinking number of end-users on the assigned List of Calls.

66.     The class members became Snap-on franchisees as part of Snap-on's "More Feet on the Street" program.  The "More Feet on the Street" program is a Deceptive Practice.

67.     Between 2000 and 2002 Snap-on added more than 300 mobile franchisees in an aggressive growth strategy to add even more consumers.  This strategy was a Deceptive Practice and many franchises failed.

### I.      The Deceptive Termination Of The Franchisees

68.     During the recruitment process, Snap-on promised franchisees that, in the event of termination, Snap-on would buy back at current prices any tools they had purchased from Snap-on but had not been able to resell.

69.     For franchisees who had accumulated a large, unsold inventory of tools, it was likely that many of the tools would be out of date according to Snap-on's part numbering system, even though they were perfectly serviceable, and perhaps indistinguishable from current models. In cases where Snap-on determined the tool to be out of date, the franchisee was not credited with the current price, but was offered only pennies on the dollar, causing the Plaintiffs to suffer a significant loss.  The risk of losing significant investment when returning unused inventory upon failure of the franchise was another material fact that was not disclosed by Snap-on to the Plaintiffs.

70.     After a franchisee left Snap-on, the economically unviable Lists of Calls, upon information and belief, was rolled over to new recruits.  Upon information and belief, the new recruits bought some of the very tools that were returned by former franchisees, but the new recruits paid more to Snap-on for the tools than Snap-on paid to the former owners.

## PRAYER FOR INJUNCTIVE RELIEF
### (Based Upon State Statutory Claims)

71.     The liberally construed Florida Deceptive Trade Practices and Unfair Competition Act (the "FDTPUA"), F.S.A. §§ 501.201 to 501.213, broadly provides that "anyone aggrieved by a violation of [the FDTPUA] may bring an action to . . . enjoin a person who has violated, is violating, or is otherwise likely to violate [the FDTPUA]." F.S.A. § 501.211(1).   Similar provisions in the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-2 (the "NJCFA"), the Texas Deceptive Trade Practices Act, Tex. Bus. & Com. Code §17.50(b)(1) (the "TDTPA"), and various other state statutes governing deceptive trade practices throughout the country also provide for injunctive relief.  Defendants are persons who have violated, are currently violating, or are likely to violate the FDUTPA, the NJCFA and the TDTPA and similar state statutes.

72.     The form of the injunction requested by Plaintiffs is to require the Defendants to cease and desist the Deceptive Practices alleged herein.

## COUNT ONE
### (Federal RICO)

73.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 75 above as if fully repeated herein.

74.     On at least two or more separate but related occasions, Defendants implemented an intentionally fraudulent and deceptive business scheme as described herein, which business scheme is designed to artificially inflate revenues by exploiting franchisees.   The business scheme, incorporated herein by reference, includes, but is not limited to, the following acts by Defendants:

- Recruit, on the basis of false and misleading representations, unsophisticated and naïve individuals to become Snap-on franchisees;

- Fail to disclose conflicts of interest with franchisees;

- Dominate and control the method, details, and day-to-day business activities of its franchisees to the detriment of its franchisees and for the sole and exclusive purpose of inflating Snap-on's sales and profits;

- Create an artificial consumer market for its automotive tool products, the purchases and sales within an economically unviable List of Calls being dominated and controlled by Snap-on;

- Provide loans to franchisees pursuant to Snap-on and Snap-on Credit's financing and credit arrangements that are unconscionable and contrary to the franchisees best interests;

- Require the franchisees to perform warranty repair work and collection work on behalf of Snap-on without paying the franchisees any compensation for the services rendered; and

- Terminate relationships with franchisees and repossess tools previously sold to franchisees at unreasonably low and unconscionable prices.

75.     In furtherance of the aforesaid intentionally fraudulent business scheme, Defendants made extensive use of the United States mails in violation of 18 U.S.C. § 1341 (mail fraud).

76.     In furtherance of the aforesaid intentionally fraudulent business scheme, Defendants made numerous telephone calls, sent numerous faxes, sent e-mails, posted web pages and otherwise used interstate wire facilities in violation of 18 U.S.C. § 1343 (wire fraud).

77.     Each individual instance of mail and wire fraud constitutes an instance of "racketeering activity" as defined in 18 U.S.C. § 1961(1).

78.    The multiple acts of racketeering activity by Defendants were centrally coordinated, and were part of a common and interrelated pattern of an intentionally fraudulent business scheme to defraud franchisees and were perpetrated for the same or similar purpose, thus constituting a "pattern of racketeering activity" as defined by 18 U.S.C. § 1961(5).

79.    Defendants together form an "enterprise" as defined in 18 U.S.C. §§ 1961(4) and 1962.

80.    Through said pattern of racketeering activity:

a.    Defendants fraudulently, unlawfully, willfully, and knowingly made millions of dollars on sales of tools and loans to franchisees.  They used the money derived from those sales and loans in the business of Defendants, the RICO enterprise, in violation of 18 U.S.C. § 1962(a);

b.    Defendants acquired and maintained, directly or indirectly, an interest in, or control of, an enterprise in violation of 18 U.S.C. § 1962(b);

c.    Defendants conducted and participated, directly or indirectly, in the conduct of said enterprise in violation of 18 U.S.C. § 1962(c);

d.    Defendants conspired together to do those things enumerated in subparagraphs a-c above in violation of 18 U.S.C. § 1962(d).

81.    As a result of the foregoing pattern of racketeering activity and violations of law, and the receipt of monies derived from the business scheme, and the acquisition and maintenance of control over the activities of Snap-on and Snap-on Credit, Snap-on franchisees have been injured in their business, property, and person within the meaning of 18 U.S.C. § 1964 (c). Damages to the Snap-on franchisees include, but are not limited to:

- Lost out-of-pocket expenses;

- Lost business opportunities;

- Lost profits;

- Lost compensation; and

- Lost good will.

**WHEREFORE**, plaintiffs demand that a Class be certified as set forth above, and that judgment be entered against Defendants, ordering:

a.      An award to the plaintiff Class of monetary damages in treble the amount of its actual damages;

b.      An award to the plaintiff Class of its reasonable attorney's fees, interest, and costs;

c.      Injunctive relief as specifically set forth herein; and

d.      Such other relief as this Court finds reasonable and proper.

### COUNT TWO
### (State Statutory Claims)

82.      Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 81 above as if fully repeated herein.

83.      As a result of the systemic Deceptive Practices described herein, Plaintiffs are persons who have suffered a loss as a result of violation of the FDUTPA, the NJCFA, the Florida Franchise Act F.S.A. § 817.416 ("FFA"), the TDTPA, and all similar state statutes prohibiting deceptive trade practices, deceptive franchise practices and consumer fraud, and are "aggrieved" within the scope of those statutes.  All Defendants are persons who have violated the FDUTPA, the NJCFA, the FFA, the TDTPA, and other similar statutory provisions governing the class;

84.      The Deceptive Practices alleged herein offend the established public policy and are immoral, unethical, oppressive, unscrupulous and substantially injurious to Plaintiffs.

85.     As a result of Defendants' Deceptive Practices, Plaintiffs have suffered a loss within the meaning of the FDUPTA, the NJCFA, the FFA, the TDTPA, and similar state statutes.

**WHEREFORE**, Plaintiffs demands that a Class be certified as set forth above, and that judgment be entered against Defendants, jointly and severally, ordering:

(a)    An award to the Class of monetary damages, including treble damages, as appropriate pursuant to FDUPTA, NJCFA, FFA, TDTPA and other similar statutory provisions governing the class;

(b)    An award to the Class of its reasonable attorney's fees, interest, and costs pursuant to FDUPTA, NJCFA, FFA, TDTPA and other similar statutory provisions governing the class;

(c)    Injunctive relief as specifically set forth herein;

(d)    Rescission of particular Standard Franchise Agreements, at the election of the Class member; and

(e)    Such other relief as this Court finds reasonable and proper.

### COUNT THREE
### (Common Law Fraud)

86.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 85 above as if fully repeated herein.

87.     Defendants intentionally and knowingly made affirmative misrepresentations and omissions and failed to disclose material facts to Plaintiffs. Defendants knew or should have known the misrepresentations and omissions were materially false and they intended Plaintiffs to rely and act on them as a result of which Plaintiffs suffered injuries.

88.     The affirmative misrepresentations and omissions and failures to disclose material facts are described herein.

89.     As a direct and proximate result of the affirmative misrepresentations and material nondisclosures by all Defendants, Plaintiffs suffered damages.

**WHEREFORE**, Plaintiffs demand that a Class be certified as set forth above, and that judgment be entered against all Defendants, ordering:

(a)     An award to the Class of monetary damages, as appropriate;

(b)     An award to the Class of its reasonable attorney's fees, interest, and costs;

(c)     Injunctive relief as specifically set forth herein; and

(d)     Such other relief as the Court finds reasonable and proper.

<u>COUNT FOUR</u>
**(Breach of Contract – against Snap-on)**

90.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 89 that are independent from the Deceptive Practices alleged therein.

91.     Plaintiffs signed a form franchise agreement with Snap-on.   The agreement is adhesive.

92.     Independent of the Deceptive Practices alleged herein, Snap-on also breached the franchise agreements with Plaintiffs in, by way of example and not limitation, the following ways:

- Failing to provide adequate training;

- Failing to provide appropriate business advice; and

- Requiring free labor by Plaintiffs to collect monies on behalf of Snap-on and to repair tools under Snap-on's warranty program.

93.     Snap-on's breach of contract directly and proximately caused damages to the Plaintiffs independent from the Deceptive Practices alleged herein that include, but are not limited, to the following:

- Loss of Franchise Investment;

- Lost out-of-pocket expenses;

- Lost earnings;

- Lost business opportunities;

- Lost profits; and

- Consequential damages.

94.     The acts constituting the breach of contract alleged herein are independent from the Deceptive Practices alleged herein.

**WHEREFORE,** Plaintiffs demand that a Class be certified as set forth above, and that judgment be entered against Snap-on ordering:

(a)     An award to the Class of monetary damages, as appropriate;

(b)     An award to the Class of its reasonable attorney's fees, interest, and costs;

(c)     Rescission of the Franchise Agreements;

(d)     Nullification and Release of any claims made against members of the Class by Snap-on or by Snap-on Credit;

(e)     Injunctive relief as specifically set forth herein; and

(f)     Such other relief as the Court finds reasonable and proper.

<u>**COUNT FIVE**</u>
**(Breach of Fiduciary Duty – against All Defendants)**

95.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 97 above as if fully repeated herein.

96.     At all times relevant hereto, all Defendants had a fiduciary relationship with Plaintiffs and owed a fiduciary duty to Plaintiffs to act in utmost good faith with care and undivided loyalty.   This fiduciary duty derives from the special relationship and special circumstances between all Defendants and Plaintiffs as more particularly described herein. All Defendants breached their fiduciary duty owed to Plaintiffs.

**WHEREFORE**, Plaintiffs demands that a Class be certified as set forth above, and that judgment be entered against all Defendants ordering:

    (a)    An award to the Class of monetary damages, as appropriate;

    (b)    An award to the Class of its reasonable attorney's fees, interest, and costs;

    (c)    Injunctive relief as specifically set forth herein; and

    (d)    Such other relief as the Court finds reasonable and proper.

**COUNT SIX**
**(Breach of Implied Covenant of Good Faith and**
**Fair Dealing against Snap-on and Snap-on Credit)**

97.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 96 above as if fully repeated herein.

98.    Every franchise agreement and other agreement between Snap-on, Snap-on Credit and Plaintiffs include not only express written provisions, but also terms and conditions which, although not formally expressed, are implied by law. Such implied terms are as binding as the terms that are actually written into the agreements.

99.    One of the implied contractual terms is the covenant of good faith and fair dealing. The covenant of good faith and fair dealing governs the dealings and reasonable expectations of the parties.

100.    The obligations of Snap-on and Snap-on Credit to abide by the covenant of good faith and fair dealing is heightened by the substantial imbalance of power as between Plaintiffs and Snap-on as well as Snap-on Credit. This imbalance allowed Snap-on and Snap-on Credit to implement the Deceptive Practices described in detail.

101.   Snap-on and Snap-on Credit breached the implied covenant of good faith and fair dealing by virtue of the Deceptive Practices described herein and by acts independent of the Deceptive Practices.

102.   As a direct and proximate result of the breach of covenant of good faith and fair dealing, franchisees have been damaged.

**WHEREFORE**, Plaintiffs demand that a Class be certified as set forth above, and that judgment be entered against Snap-on and Snap-on Credit, ordering:

(a)   An award to the Class of monetary damages, as appropriate;

(b)   An award to the Class of its reasonable attorney's fees, interest, and costs;

(c)   Injunctive relief as specifically set forth herein; and

(d)   Such other relief as the Court finds reasonable and proper.

McELROY, DEUTSCH, MULVANEY & CARPENTER, LLP

*Edward B Deutsch*

EDWARD B. DEUTSCH, ESQ.
RONALD J. RICCIO, ESQ.
DONNA DUBETH GARDINER, ESQ.
1300 Mt. Kemble Avenue
Morristown, New Jersey  07962-2075
973/993-8100

**MARKS & KLEIN, LLP**
GERALD A. MARKS, ESQ.
JUSTIN M. KLEIN, ESQ.
63 Riverside Avenue
Red Bank NJ 07701
732/747-7100

Attorneys for Plaintiffs