NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| RONALD DESANTIS, MATT SETSER, SHAWN DICKMYER, WILLIAM BRADLEY FREEMAN, SCOTT FACTOR, SCOTT INGENTO, AARON REEVES, ANTHONY HOBBY, DWIGHT LANKART, RICHARD FORTUNA, and PAUL VLADYKA, on behalf of themselves and all others similarly situated, | **Hon. Dennis M. Cavanaugh**  **OPINION**  Civil Action No. 06-cv-2231 (DMC) |
| Plaintiffs, | |
| v. | |
| SNAP-ON TOOLS COMPANY, LLC, SNAP-ON CREDIT, LLC, and SNAP-ON INCORPORATED, | |
| Defendants. | |

DENNIS M. CAVANAUGH, U.S.D.J.:

This matter comes before the Court upon the application of Class Plaintiffs Ronald Desantis,

Matt Setser, Shawn Dickmyer, William Bradley Freeman, Scott Factor, Scott Ingento, Aaron Reeves,

Anthony Hobby, Dwight Lankart, Richard Fortuna, and Paul Vladyka ("Class Plaintiffs"), pursuant

to Fed. R. Civ P. 23(e), for Final Approval of the Settlement Agreement with Defendants Snap-on

Tools Company, LLC, Snap-on Credit, LLC, and Snap-on Incorporated (Snap-on Inc."). A hearing

on the application for Final Approval was held by this Court on August 28, 2006. Also before this

Court is Class Counsel's application for approval of attorneys' fees and reimbursement of expenses.

For the reasons set forth below, the Court approves the Settlement Agreement and Class Counsel's

application for attorneys' fees and expenses.

I.    BACKGROUND

    A.    Procedural History

        1.    The Hochberg Action

On September 25, 2003, Class Counsel, on behalf of Plaintiffs Michael Marron, Jeffrey Goldwasser, Aaron Reeves, and Anthony Hobby, filed a Class Action Complaint against Defendants Snap-on Tools Company, LLC ("Tools") and Snap-on Credit, LLC ("Credit").  Civil Case No. 03-cv-04563 (FSH)(PS) ("Hochberg Action").  Judge Hochberg granted Tools' Motion to Compel Arbitration on or about July 1, 2004.  Judge Hochberg determined that the arbitrators were to determine whether class actions in arbitration should be permitted.  Tools filed a Notice of Appeal of Judge Hochberg's Order with the United States Circuit Court of Appeals for the Third Circuit. On or about August 23, 2005, this appeal was dismissed by the Third Circuit.

Due to an error of service, Credit  was not properly served with a Complaint and a separate action had to be filed against Credit.  Therefore, Judge Hochberg's July 1, 2004 Order did not apply to Credit.  On July 7, 2004, Credit filed a Motion to Dismiss the Complaint against it.  On September 29, 2004, Judge Hochberg granted Credit's Motion, without prejudice.  Thereafter, on October 13, 2004, Class Counsel filed a new action with Credit being named as the sole defendant.  Judge Hochberg granted Class Counsel's Motion to Compel Arbitration.  This decision was also appealed to the Third Circuit by Credit and was also dismissed.  The parties consented to consolidate the Credit Action and the Hochberg Action in the American Arbitration Association ("AAA").

        2.    Proceedings Before the AAA

The AAA refused Tools' request for a single arbitrator.  Tools and Credit sought review of

this decision from Judge Hochberg.  On May 4, 2005, Credit agreed to the jurisdiction of the AAA and agreed to fully participate in the six pending arbitrations.

Each of the six arbitrations involved discovery, briefing and conferences between the parties and arbitrators.  Both the Hobby and Fortuna arbitrations resulted in the arbitrators finding that the contested clause in the Franchise Agreement does not preclude class actions.  Both of these decisions were contested by Defendants before Judge Hochberg.  The Van Curen arbitration was resolved through a settlement.  The Reeves, Lankart and Vladyka arbitrations were all stayed pending settlement discussions.

### 3.   Florida State Court Class Action

On or about December 6, 2004, Class Counsel, on behalf of Plaintiffs Ronald DeSantis, Shawn Dickmyer, Scott Factor, William Bradley Freeman, Scott Ingenito, and Matt Setser, filed a Class Action Complaint in Florida state court, Sixth Judicial Circuit, Pinellas County, Case No., 04-008709CI against Defendants.  On September 14, 2005, the Florida court granted Tools' Motion to Compel Arbitration.  After unsuccessful motions for reconsideration and interlocutory appeal, Tools' request to stay the arbitrations was denied by the AAA on December 13, 2004.  The AAA also denied Defendants' request for a single arbitrator.  In or about early May 2006, the parties filed motions and cross-motions in all but two of the pending arbitrations seeking, *inter alia*, preliminary injunctive relief by Plaintiff and dismissing the class actions by Respondents.  Detailed case management schedules have been implemented by the arbitrators with extensive briefs and hearings scheduled throughout the summer of 2006.

### 4.   The Instant Action

Class Plaintiffs, on behalf of themselves and all others similarly situated, filed a Complaint

against Defendants on May 17, 2006. Plaintiffs are eleven former franchisees of Defendant Snap-on Tools, some of whom were also borrowers from Snap-on Credit. Defendants allege that certain of the Class Plaintiffs owe monies to either Snap-on Tools or Snap-on Credit. (Comp. ¶1-11.) In the Complaint, Class Plaintiffs allege that due to certain deceptive business practices, their franchises were caused to fail. More specifically, the Complaint alleges that Defendants targeted unsophisticated persons to become franchisees for Snap-on Inc. Additionally, the Complaint alleges that franchisees are contractually required to make minimum weekly purchases of product from Snap-on Tools. The Complaint further alleges that these products can only be re-sold by franchisees to a limited number of end-users. The Complaint seeks, *inter alia*, injunctive relief and monetary damages.

This Court issued an Order on May 16, 2006, preliminarily approving the settlement and providing for class notice.[1] Pursuant to that Order, the class action administrator, LECG, LLC, distributed 2,938 Notices of Pendency and Class Action and Proposed Settlement ("the Notice") via first class mail to Former Franchisees and 3,180 Notices to Current Franchisees. A Fairness Hearing for final approval of the Settlement Agreement was held on August 28, 2006.[2]

### B.      Settlement Agreement

The Settlement Agreement provides for both monetary and non-monetary benefits to the Class. Pursuant to the Settlement Agreement, the Class is defined as "all persons in the United

---

[1]      That Order was amended several times during June and July, with a Fourth Amended Order signed by the Court on July 18, 2006.

[2]      An error in mailing occurred and this Court allowed an additional 60 days for objections to be filed. No such objections were filed.

States who were or are currently franchisees." (Settlement Agreement ("SA"), ¶2.4). "Franchisees"

are defined as:

> all individuals or entities in the United States who, from January 1, 1998 through April 18, 2006, operated one or more franchises, independent dealerships, and/or conversion franchisees, but does not include trial franchisees or employees of independent contractors of Franchisees. "Former Franchisee" is a Franchisee who has sent in notice to terminate or has been sent a letter of termination or has otherwise terminated by April 18, 2006 and has checked in prior to May 30, 2006.

(SA ¶2.17). The monetary and non-monetary benefits vary depending on franchisee status.

### 1. Benefits of Settlement to Former Franchisees

Approximately $61.6 million[3] in Former Franchisee debt will be discharged and forgiven by

Defendants as a result of the settlement agreement. Also, letters will be sent to all credit reporting

agencies to correct any negative credit reports stemming from debt allegedly owed to Defendants by

Former Franchisees. Finally, Former Franchisees who responded to the Notice were eligible for

either one of two optional cash payments. Option A provided responding Former Franchisees with

a cash payment of $1,000 and a Release. Option B provides for a cash payment of up to $20,000 to

each Former Franchisee per each franchise operated. The estimated total cash payments to the class

is $25 million.

### 2. Benefits of Settlement to Current and Prospective Franchisees

Current and Prospective Franchisees will receive benefits from the settlement which include

a possible qualification for an additional amount of money as a credit to their Snap-on Tools

statement  for each franchise based on the average weekly paid sales. Defendants have also agreed

---

[3]  Originally, the estimated debt forgiveness was $75 million. However, this figure was the result of an accounting error and accurate amount of debt forgiveness pursuant to the Settlement Agreement will be $61.6 million. (Rabenhurst Declaration, ¶2, 3).

to make a number of modifications to the Snap-on Tools franchise distribution model and business practices, designed to benefit both Current and Prospective Franchisees. These include, *inter alia*, a reduction of the required investment for initial inventory, offers of financing to qualified franchisees who have been on credit hold for five of the last ten weeks prior to the date of the final approval of the Settlement Agreement, a technology credit, making reasonably available improved initial training for new franchisees, and improvement of recruitment training practices. The following valuations have been provided for these changes: $4,522,847 for the reduction cost on initial inventory, $3,816,000 for the technology credit, and $27,600,000 for the improved training. Additionally the estimated cost of design and implementation of changes is $4 million. These figures, combined with the estimated cash payments to class members equals benefits valued at over $64 million.

### 3.    Benefit to Representative Plaintiffs

Representative Plaintiffs will be paid no more than $50,000 as compensation and consideration for the time they have spent working with Class Counsel on this matter and the sacrifices they have made as a result. Specifically, Representative Plaintiffs acted as private attorneys general, working with Class Counsel and helping to bring the Settlement to fruition. Defendants have also agreed to pay former franchisees who retained counsel on or before April 18, 2006 an Incentive Award of not more than $15,000. The final amount of the Incentive Award is to be determined by the Court, and therefore does not diminish any of the other benefits provided to any Class Member.

4.      Retention of Jurisdiction

The Settlement Agreement also provides that this Court will retain jurisdiction over implementation and enforcement of all terms of the Agreement. Furthermore, all parties have agreed to submit to the jurisdiction of the Court for purposes of implementing and enforcing the Settlement.

II.     APPROVAL OF THE SETTLEMENT AGREEMENT

A.      Satisfaction of Rule 23 Criteria for Class Certification

The Court must certify the Class of Franchisees pursuant to the requirements of Federal Rule of Civil Procedure 23(a) and (b). See Anchem Prod., Inc. v. Windsor, 521 U.S. 621-22 (1997). In determining whether certification is appropriate, this Court may take the Settlement Agreement into consideration. See In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions, 148 F.3d 283, 308 (3d Cir. 1998) cert denied, 525 U.S. 1114 (1999).

1.      Rule 23(a) Requirements

To certify a class, Rule 23(a) requires that there be numerosity, commonality, typicality and adequacy of representation. Fed. R. Civ. P. 23(a). Here, the numerosity requirement is met because the Class has well over 5,000 members. Joinder of this many Plaintiffs is clearly not feasible. See Stewart v. Abraham, 275 F.3d 220, 226-27 (3d Cir. 2001). Commonality exists because there are common questions of law and fact. Baby Neal for and by Kanter v. Casey, 43 F.3d 48, 56 (3d Cir. 1994). Plaintiffs' claims arise from a common nucleus of operative facts, namely, Defendants' alleged deceptive business practices. Furthermore, there is commonality among the questions of law raised because the same legal and equitable claims are asserted by Plaintiffs and Class Members

-7-

against Defendants.  The typicality requirement is also met here because the interests of the Class and the Lead Plaintiffs are "aligned."  In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 531 (3d Cir. 2004).  Specifically, the claims of the Plaintiffs and of the Class arise from the same alleged deceptive business practices and therefore their interests are properly aligned.  Finally, there is adequacy of representation because the Class Plaintiffs' and Class Members' interests are aligned, as stated immediately above; and also, because  there has been a strong showing that Class Counsel are qualified to handle this type of complex litigation.  For these reasons, the requirements of 23(a) for class certification are satisfied in this case.

### 2.    Rule 23(b) Requirements

In a case where money damages predominate, class certification is appropriate where common questions predominate and class resolution is the superior method for the fair and efficient adjudication of the controversy.  As discussed above, common questions of fact and law predominate in this case.  Furthermore, for purposes of Rule 23(b), these "questions of law or fact common to members of the Class predominate over any questions affecting only individual members."  Fed. R. Civ. P. 23(b)(3).  Specifically, each Class Member's claims depend upon resolution of the same factual and legal questions regarding the Defendants' alleged deceptive business practices.  See Warfarin, 391 F.3d at 528; In re Cmty. Bank of N. Virginia, 418 F.3d 277, 309 (3d Cir. 2005) (cases where Third Circuit found the predominance requirement satisfied because the claims arose from Defendants' same fraudulent scheme).

Even though the laws of various states differ as to the claims raised by this nationwide class of Franchisees, this Court still finds that there is Rule 23(b) predominance.  The Third Circuit has

noted that "the same concerns with regards to case manageability that arise with litigation Classes are not present with Settlement Classes, and thus these variations [in state laws] are irrelevant to certification of a settlement class." Warfarin, 391 F.3d at 529. Furthermore, the same common issues regarding Defendants' business practices still lie at the core of Class Members' claims.

Finally, it is clear that approving the settlement is a superior method of resolving these claims. Approving this Settlement Agreement is a more efficient and less risky means of addressing Class Members' grievances.

Based on the foregoing, the proposed Settlement Class is certified pursuant to Rule 23(b)(3).

**B.     Satisfaction of Rule 23(e) Standard**

Federal Rule of Civil Procedure 23(e), provides that "[a] class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such a manner as the court directs." Fed. R. Civ. P. 23(e). In determining whether to approve a class action settlement pursuant to Rule 23(e), " 'the district court acts as a fiduciary who must serve as a guardian of the rights of absent class members' " In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig., 55 F.3d 768, 785 (3d Cir.1995) (quoting Grunin v. Int'l House of Pancakes, 513 F.2d 114, 123 (8th Cir.), cert. denied,423 U.S. 864 (1975) (citation omitted)).

Before giving final approval to a proposed class action settlement, the Court must determine that the settlement is "fair, adequate, and reasonable." Lazy Oil Co. v. Witco Corp., 166 F.3d 581, 588 (3d Cir. 1999); Walsh v. Great Atl. & Pac. Tea Co., 726 F.2d 956, 965 (3d Cir.1983). In Girsh v. Jepson, the Third Circuit identified nine factors, so-called "Girsh factors," that a district court

should consider when making this determination:

(1)     the complexity, expense and likely duration of the litigation;
(2)     the reaction of the class to the settlement;
(3)     the stage of the proceedings and the amount of discovery completed;
(4)     the risks of establishing liability;
(5)     the risks of establishing damages;
(6)     the risks of maintaining the class action through the trial;
(7)     the ability of the defendants to withstand a greater judgment;
(8)     the range of reasonableness of the settlement fund in light of the best possible recovery;
(9)     the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

521 F.2d 153, 157 (3d Cir.1975).  "These factors are a guide and the absence of one or more does not automatically render the settlement unfair."  In re American Family Enterprises, 256 B.R. 377, 418 (D.N.J. 2000).  Rather, the court must look at all the circumstances of the case and determine whether the settlement is within the range of reasonableness under Girsh.  In re Orthopedic Bone Screw Prod. Liab. Litig., 176 F.R.D. 158, 184 (E.D.Pa.1997).

Since Girsh was decided there has been a "sea-change in the nature of class actions." Prudential, 148 F.2d at 323.  Thus, district courts should also consider other relevant and appropriate factors.[4]  See also In re AT&T Corp. Sec. Litig., 455 F.3d 160 (3d Cir. 2006).  In sum, the Court's assessment of whether the settlement is fair, adequate and reasonable is guided by the Girsh factors,

_____

[4]     The Prudential court suggested that district courts may consider "the maturity of the underlying substantive issues, as measured by the experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages; the existence and probable outcome of claims by other classes and subclasses; the comparison between the results achieved by the sentiment for individual class or subclass members and the results achieved  -or likely to be achieved - for other claimants; whether class or subclass members are accorded the right to opt out of the settlement; whether any provisions for attorneys' fees are reasonable; and whether the procedure for processing individual claims under the settlement is fair and reasonable."  148 F.3d at 323.

but the Court is in no way limited to considering only those enumerated factors and is free to consider other relevant circumstances and facts involved in this settlement.

**B.     Application Of Girsh Factors To This Case**

The Court has considered the proposed settlement in keeping with the <u>Girsh</u> factors and finds that the balance of factors weigh in favor of approval.  Particularly, this Court is very satisfied that this innovative hybrid settlement not only compensates Class Plaintiffs for past injuries but also provides non-monetary relief in the form of changes to Snap-on's internal business that will benefit Current and Prospective Franchisees in the future.

**1.     Complexity, Expense and Likely Duration of Litigation**

This factor is concerned with assessing the "probable costs, in both time and money, of continued litigation."  <u>In re Cendant Corp. Litig.</u>, 264 F.3d 201, 234 (3d Cir. 2001).  While this case was only filed in early 2006, as recounted in the procedural history above, it is part of a complex series of cases and therefore has a long detailed history.  This case is the culmination of eleven separate class action arbitrations.  The various litigations required an analysis of a wide range of legal and factual issues, including franchise law, arbitration law, public injunction law, and corporate law.

       If fully litigated, this case would likely be very expensive because Defendants have and would continue to vigorously contest the class action.  Extended discovery, expert reports and motion practice would make this litigation costly for all parties.  To the contrary, the settlement was only reached after extensive arms-length negotiations between the parties, and thereby avoids years of contentious litigation.

This Court is satisfied that the first Girsh factor weighs heavily in favor of approving the Settlement.

2.      Reaction of Class to Settlement

This factor requires the Court to evaluate whether the number of objectors, in proportion to the total class, indicates that the reaction of the class to the settlement is favorable.  Here, as of August 21, 2006, there were only four objectors, equal to less than 0.07% of the total class.  Notably, as of August 21, 2006, the percentage of opt-outs is only 3.9%.  The Third Circuit has repeatedly recognized that low numbers of objectors and opt-outs is probative on the issue of whether a settlement is fair, adequate and reasonable.  Warfarin, 391 F.3d at 536.  This Court is persuaded that the few number of objectors and opt-outs weighs heavily in favor of approving the Settlement .

Additionally, the lack of merit of the objectors' arguments also weighs in favor of approving the Settlement.  As is discussed in more detail below, the objectors' arguments are not persuasive and do not provide sufficient grounds for this Court to find that the Girsh factors do not weigh in favor of approving the settlement.  In light of the very few objectors to the Settlement Agreement and the weak nature of the objectors' claims, this Court is satisfied that the second Girsh factor weighs heavily in favor of approving the Settlement.

3.      Stage of Proceedings and Amount of Discovery Completed

Pursuant to the third Girsh factor, the Court must consider the "degree of case development that Class Counsel have accomplished prior to Settlement," including the type and amount of discovery already undertaken. GMC Pick-Up Truck, 55 F.3d at 813.  See also Prudential, 148 F.3d at 319.  In considering this factor, this Court may consider not only discovery in the instant action

-12-

but also discovery taken in "related or companion proceedings." GMC Pick-Up Trucks, 55 F.3d at

813.  Review of the amount of discovery completed in the case informs the Court of "whether

counsel had an adequate appreciation of the merits of the case before negotiating."  Id.  See also

AT&T, 455 F.3d at 167 (noting extent of discovery).

        In this case, the evidence shows that Class Counsel were well-apprised of the merits of the

case before and during negotiation.  Specifically, Class Counsel engaged in pre-filing investigative

work starting in May 2003.  Class Counsel performed  extensive research to vigorously challenge

an arbitration clause and a clause allegedly precluding class actions.  Furthermore, Plaintiffs utilized

the work of two experts on the channel stuffing and revenue recognition claims.  Depositions were

conducted on these issues by both sides.

        Based on the foregoing, this Court is persuaded that the third Girsh factor weighs in favor

of approving the Settlement Agreement.

                4.      Risks of Establishing Liability and Damages

        The Court must consider the rewards that might have been gained if the case was litigated

balanced against the benefits of immediate settlement.  See GMC Pick-Up Truck, 55 F.3d at 814;

Prudential, 148 F.3d at 319.  Litigation poses many risks for Franchisees.  To prevail at trial,

Franchisees would have to attain Class certification as well prove liability and damages.  Plaintiffs

would have to expend time and money to make these showings, without any guarantee of success.

        In this case, the risks of litigation are great because Plaintiffs' claims involve complex and

contested questions of law.  Furthermore, prevailing on these claims would require expert testimony

from each side.  Thus, at trial, this case could easily become a battle of the experts, lessening

-13-

Plaintiffs' likelihood of success.  Defendants' submissions have made it clear to this Court that they intend to contest the issue of liability as well as the legal basis of Plaintiffs' claims.  For these reasons, Plaintiffs face many obstacles in attaining a successful result at trial and these Girsh factors weigh in favor of approving the Settlement Agreement.

### 5.   Risks of Maintaining the Class Action Through Trial

While this Court approves certification of the settlement class, the Court must consider whether there is a risk that the class could not be maintained during trial.  Pursuant to Federal Rule of Civil Procedure Rule 23, a court may decertify a class during litigation if it proves to be unmanageable.  See Prudential, 148 F.3d at 321.  Here, not only do Plaintiffs have to attain certification and avoid decertification during litigation, they must also effectively rebut Defendants' argument that a clause in the franchise agreement prohibits class actions.  While this issue has been decided in favor of some of the Class Plaintiffs through arbitration, there are still other arbitrations pending on this same issue.  Therefore, great risks are posed in even getting this class certified for purposes of litigation.

Additionally, the Third Circuit has recently reiterated that if Defendants have a unique defense against a Class that "will play a significant role at trial" then decertification may be necessary.  Beck v. Maximus, Inc., 457 F.3d 291, 300 (3d Cir. 2006).  In this case, Defendants are not only likely to continue to contest class certification but will also argue that the different choice-of-law issues involved in the state law claims render the class action unmanageable.

Bearing these risks and obstacles in mind, and having determined that certification of the settlement class is appropriate, this factor weighs in favor of approving the Settlement Agreement.

-14-

6.      Ability of Defendants to Withstand a Greater Judgment

To evaluate whether the Settlement Agreement is fair to Plaintiffs, the Court must evaluate

whether Defendants could withstand a judgment much greater than the amount of the settlement.

See Cendant, 264 F.3d at 240; Prudential, 148 F.3d at 321-22; GMC Pick-Up Truck, 55 F.3d at 818.

This factor does not weigh in favor of approving the Settlement Agreement because there have been

no claims by either party that the solvency of Snap-on Inc. would be threatened by an award to

Plaintiffs.  However, as noted above, approval of a settlement may still be appropriate even if all the

factors do not weigh in favor of approval.

7.      Range of Reasonableness of the Settlement Fund in Light of the Best Possible
         Recovery and in Light of all the Attendant Risks of Litigation

To assess the reasonableness of the Settlement Agreement, this Court must compare the value

of the proposed settlement against "the present value of the damages plaintiffs would likely recover

if successful, appropriately discounted for the risk of not prevailing." GMC Pick-Up Truck, 55 F.3d

at 806.  Based on their discovery, investigation and evaluation of the facts and law relating to all

matters alleged in the pleadings, Plaintiffs and Defendants have agreed to a settlement that will

provide substantial monetary and non-monetary benefits to Class Plaintiffs.  Plaintiffs and

Defendants agree and clearly document that the Settlement Agreement offers Class Members value

in excess of $125 million.  Furthermore, the hybrid nature of this settlement, providing both

monetary and non-monetary benefits, effectively compensates Plaintiffs for their claimed injuries

and makes changes to benefit Current and Prospective Franchisees.  Due to the complex nature of

this litigation, the parties would have faced great risk and uncertainty should the suit have proceeded

to trial, with no guarantee of recovery.  Even if it is possible that Plaintiffs could have won more

substantial money damages at trial, it is unclear that they would have obtained the desired modifications to the Snap-on business model.  Weighing the risks of recovery against the satisfactory results Class Members receive with settlement, it is clear that these factors weigh in favor of approving the Settlement Agreement.

In sum, the Court finds that the Settlement is fair, adequate, reasonable and proper, and is in the best interests of the Class.  Accordingly, the Court approves the Settlement.

### III.   APPROVAL OF FEE AWARD

In approving attorneys fees in a class action settlement, this Court must evaluate "what class counsel actually did and how it benefitted the class."  Prudential, 148 F.3d at 342.  The Third Circuit recently repeated the standard for approving attorneys fees in a class action settlement: "afford a presumption of reasonableness to fee requests submitted pursuant to an agreement between a properly-selected lead plaintiff and properly-selected lead counsel," yet this presumption is rebuttable "when a district court finds the fee to be prima facie excessive."  Cendant, 264 F.3d at 220.  Still, this presumption does not alleviate this Court's burden of acting as the Class Members' fiduciary because the Third Circuit has "caution[ed] against affording the presumption too much weight at the expense of the court's duty to act as 'a fiduciary guarding the rights of absent class members.' "  AT&T, 455 F.3d at 175 (citing Cendant 264 F.3d at 231).

Here, Class counsel's attorneys fees are calculated by using a percentage of recovery method, applying a certain percentage to the settlement fund.  See In re Cendant Corp. PRIDES Litig., 243 F.3d 722, 732 n.10 (3d Cir. 2001).  Class Counsel seek approval of their requests for fees in the

amount of $13 million, the equivalent of 10.4% of the settlement.  Also, Class Counsel seeks reimbursement of expenses in the amount of $166,485.26 for McElroy, Deutsch, Mulvaney & Carpenter, LLP and $200,688.49 for Marks & Klein, LLP.  Defendant does not oppose Class Counsels' motion.

Class Counsel submit that the settlement agreement will confer a benefit on the class in excess of $125 million.  The Settlement Agreement also provides for debt forgiveness estimated to be the equivalent of $61.6 million.  Finally, the Settlement Agreement requires the Defendants to make modifications and enhancements to its current business practices that will benefit the Class Members.  Class Counsel estimate the value of these modifications to be approximately $60 million.

The Third Circuit's recent decision of In re AT&T Corporation Securities Litigation states that "[i]n reviewing an attorneys' fees award in a class action settlement, a district court should consider the Gunter factors, the Prudential factors, and any other factors that are useful and relevant with respect to the particular facts of the case."  455 F.3d at 166.  The Gunter factors and Prudential factors are substantially similar to the factors provided by Girsh.[5]  To avoid redundancy, this Court incorporates by reference its above discussion of the Girsh factors and the reasons given for approval of the settlement.  Additionally, there are further reasons why the attorneys fees are reasonable in this matter and should be approved.

---

[5]     The factors listed in Gunter include: "(1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) the awards in similar cases."  Gunter v. Ridgewood Energy Corp., 223 F.3d 190, 195, n.1.  Similarly, the factors listed in Prudential include: size of the fee award, fee percentages in other class actions, quality of class counsel, fee percentage that would have been negotiated between private parties, and size of the expected recovery under the proposed settlement.  Prudential, 148 F.3d at 339.

First, the 6,118 class members will share in a recovery of approximately $125 million. This is an impressive ratio for the size of the fund and the number of persons benefitted. Additionally, there is an absence of substantial objections to the requested attorneys' fees. The fact that there were so few objectors to the amount of attorneys fees indicates that there is a positive reaction amongst the class to the requested fees. Furthermore, these qualified and experienced attorneys spent a large amount of time preparing this case, arbitrating it and in negotiating a settlement, all with the risk of a very contentious litigation looming without any guaranteed successful result. Importantly, Class Counsel in this case achieved a very favorable and creative settlement that properly benefits all members of the class.

This fee award is in no way greater than the fees awarded in similar cases. Specifically, the fee application seeks only 10.4% of the settlement amount, a figure well below the norm. See Cendant PRIDES Litig., 243 F.3d at 736 (fee awards range from nineteen to forty-five percent); In re AremisSoft Corp. Sec. Litig., 210 F.R.D. 109 (D.N.J. 2002) (noting fee awards between one-third and one-half of the settlement); In re Safety Components, Inc. Sec. Litig., 166 F. Supp. 2d 72, 101 (D.N.J. 2001) (noting recent fee awards ranging between 27.5% and 33.8%). In fact, "[m]any courts, including several in the Third Circuit, have considered 25% to be the 'benchmark' figure for attorney fee awards in class action lawsuits, with adjustments up or down for significant case-specific factors." Varacallo v. Massachusetts Mut. Life Ins. Co., 226 F.R.D. 207, 249 (D.N.J. 2005) (quoting In re Warfarin Sodium Antitrust Litig., 212 F.R.D. 231, 262 (D.Del.2002). Additionally, the attorneys' fees are to be paid separate from the payments to the class and in no way diminish the payments made to the class.

Finally, this Court is satisfied that awarding the requested attorneys fees is appropriate because this Court retains jurisdiction and is therefore available to Class members for final resolution of any dispute or objection that may arise.

Here, the percentage of recovery Class Counsel seeks falls well below the norm. This fact, when considered in combination with the other factors recounted above, satisfies the Court of the reasonableness of the fees. As such, the Court does not deem a lodestar cross-checking to be necessary.

At this time there is a dispute among Class Counsel as to the proper allocation of the attorneys fees to be paid by Defendants. This Court needs the benefit of an evidentiary hearing and oral argument on this issue to decide the proper delineation of fees between McElroy, Deutsch, Mulvaney & Carpenter, LLP and Marks & Klein, LLP. This Court approves the requested attorneys' fees, holding that they should be held in escrow until this Court conducts an evidentiary hearing to determine proper allocation of the fees.

## IV.   OBJECTORS' ARGUMENTS

As stated above, the arguments set forth by the notably small number of objectors are not persuasive. Only one objector, Jeff Uhle ("Uhle"), appeared at the August 28, 2006 hearing for Class Action Settlement approval. The objectors generally attack the class certification as well as the adequacy, fairness and reasonableness of this settlement. As discussed fully above, this Court disagrees with these arguments because the Court finds that certification is appropriate pursuant to Federal Rule of Civil Procedure 23(a) and (b); and also that the Settlement Agreement is adequate,

fair and reasonable.  Listed below are the additional objections raised by Uhle and his fellow objectors as well as the reasons why these objections are without merit.  Uhle also raised a host of other meritless objections that the Court does not find persuasive.  The Court, acting in its fiduciary capacity to protect Class Members' interests, does not deem it necessary to summarize and dismiss each of these objections because they do not raise any questions as to whether the Settlement Agreement is fair, reasonable and adequate or whether the attorneys fees are unreasonable.

### A.     Value of Settlement is Misrepresented

Objector Uhle argues that the value of the settlement is misrepresented because there is insufficient information on the payments to be made to Class Members and no evidence that the forgiveness-of-debt equals $61.6 million.  First, amounts paid to Class Members pursuant to Option B will be determined under a disclosed formula, utilizing factors designed to ensure intra-class fairness.  Second, the parties submitted a sworn verification as to the amount of the debt forgiveness. The value of the settlement to Franchisees has been carefully documented and explained and the Court is unpersuaded by the argument that the settlement's value has been misrepresented.

### B.     Lack of Information on Internal Business Changes

There is also an objection to the lack of information concerning the internal business changes Defendant will undertake pursuant to the Settlement Agreement.  The business changes agreed upon through settlement have been characterized as the most significant in Snap-on's history.  They specifically address the alleged deceptive practices that Plaintiffs complained of.  The declarations submitted by the parties evidence that Snap-on has seriously studied this matter and made a commitment to these changes.  Additionally, this Court retains jurisdiction over this matter and can

thereby resolve any disputes regarding the promised internal business modifications.

Objector Uhle complains that some of the deceptive business practices raised in the complaint are not addressed in the settlement agreement. This is a meritless objection, disregarding the fact that this settlement is the product of negotiation - an attempt by both parties to reach a fair agreement, thereby avoiding the risks of litigation.

This Court is satisfied that the parties have submitted clear and strong evidence of the internal business changes to be effected by Defendant and that Class Members also had sufficient information to decide whether the settlement was favorable to them.

**C.    Release is Too Broad**

The objectors argue that the release of Class Members' claims against Defendant is too broad. To the contrary, the release of claims in this case is consistent with Third Circuit precedent as to what claims may be released pursuant to a settlement agreement. See In re Prudential Ins. Co. of Am. Sales Practice Litig., 261 F.3d 355, 366-67 (3d Cir. 2001). Additionally, adequate notice was given to Class Members to object to the Settlement or opt out of the release of claims. Again, a notably small number of individuals chose to opt out. This Court is unpersuaded that the settlement is not reasonable, fair or adequate based on this objection.

**D.    Conflict of Interest of Class Counsel**

Uhle argues that Class Counsel have a conflict of interest because the Settlement Agreement improperly restricts Class Counsels' practice of law and the Marks firm has been limited from representing potential clients against Snap-on. Specifically, Uhle points to language in the Settlement Agreement which states that Class Counsel had "no present intention of representing any persons

-21-

who are not Class Members with respect to defendants." This is not an agreement but merely an attempt by one negotiating party to achieve finality through the settlement. The Settlement Agreement does not restrict Class Counsel's right to represent any future clients and therefore does not create any impermissible conflict of interest.

###    E.    Incentive Fees Paid to Lead Plaintiffs are Disproportionate

This Court finds that the incentive awards to representative Plaintiffs are not disproportionate but fairly, adequately and reasonably compensate them for their time and efforts. Such incentive awards are common and long-established. <u>See</u> <u>In re Remeron Direct Purchaser Antitrust Litig</u>, No. Civ. 03-0085 (FSH), 2005 WL 3008808, at *18 (D.N.J. Nov. 9, 2005). Additionally, these incentive awards will not diminish any of the other benefits provided to any Class Member. The Court finds that they are not disproportionate and not grounds for finding that the settlement is not fair, adequate or reasonable.

### V.    CONCLUSION

For the reasons expressed above, Plaintiff's Motion for Final Approval of the Settlement Agreement is **granted.** The Settlement Agreement is hereby **approved**. An appropriate Order accompanies this Opinion.

        s/ Dennis M. Cavanaugh
DENNIS M. CAVANAUGH, U.S.D.J.

Date:          October 27, 2006
Original:      Clerk's Office
Cc:            All Counsel of Record
               The Honorable Mark Falk, U.S.M.J.
               File